## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

ALFREDO VILLOLDO, individually,
GUSTAVO E. VILLOLDO, individually, and
as Administrator, Executor, and Personal
Representative of the ESTATE OF GUSTAVO
VILLOLDO ARGILAGOS,

        Plaintiffs,

vs.

HSBC BANK USA, N.A., and HSBC
HOLDINGS PLC,

        Defendants.



Case No.

**COMPLAINT**
**JURY TRIAL DEMANDED**

Plaintiffs, Alfredo Villoldo, individually, Gustavo E. Villoldo, individually and as Administrator, Executor, and Personal Representative of the Estate of Gustavo Villoldo Argilagos (collectively, "Plaintiffs") sue HSBC Bank USA, N.A. and HSBC Holdings plc, and for their Complaint allege:

## JURISDICTION

1.     This Court has subject matter jurisdiction over this matter, under 28 U.S.C. § 1331, because certain claims asserted arise under the Constitution, laws, or treaties of the United States. This Court also has subject matter jurisdiction over this matter, under 28 U.S.C. § 1332, because the Plaintiffs, U.S. Citizens residing in Puerto Rico or Florida, and Defendant HSBC Bank USA, N.A., headquartered in McLean, Virginia, with its principal office in New York, New York, are citizens of different states, and Defendant HSBC Holdings plc, organized under the laws of England and Wales, is a subject of a foreign state, and the amount in controversy exceeds $75,000.00 exclusive of interest, attorney's fees and costs.

2.      This Court has personal jurisdiction over Defendants HSBC Bank USA, N.A. and HSBC Holdings plc because the entities committed tortious injury within the Southern District of New York by falsely and illicitly manipulating the appearance and indicia of ownership of the funds involved in the transfers described herein, causing the funds to appear to be the property of subsidiary banks controlled by HSBC Holdings, when the funds were the true property of agencies and instrumentalities of Cuba, for the expressed purpose of avoiding the application of US sanctions that would have resulted in these funds being frozen under U.S. law, and subsequently executed upon by Plaintiffs, as judgment creditors of Cuba.

3.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events and omissions giving rise to the Plaintiffs' claims occurred in this judicial district.

## THE PARTIES

### The Plaintiffs

4.      Plaintiff Alfredo Villoldo, individually, is a citizen of the territory of Puerto Rico. Gustavo Villoldo, individually and as the administrator, executor and personal representative of the Estate of Gustavo Villoldo Argilagos (the "Villoldos"), is a citizen of the state of Florida. Plaintiffs are judgment creditors of the Republic of Cuba, Fidel Castro Ruz, Raul Castro Ruz, the Ministry of the Interior, and the Army of the Republic of Cuba (the "Cuban Defendants").

   a.      On March 18, 2008, Plaintiffs filed an initial action against the Republic of Cuba, Fidel Castro Ruz, as an individual and as an official, employee, or agent of the Republic of Cuba, Raul Castro Ruz, as an individual and as an official, employee, or agent of the Republic of Cuba, the Ministry Of Interior, and the Army Of the Republic Of Cuba (the "Cuban Defendants") for acts of terrorism.

      b.      On August 19, 2011, Plaintiffs obtained a judgment entered by the Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade County, Florida against the Cuban Defendants for $2,790,000,000 (the "Florida Judgment"). On December 21, 2011, Plaintiffs sued on the Florida Judgment in the United States District Court for the Southern District of New York to obtain a federal judgment. On October 25, 2012, the United States District Court for the Southern District of New York entered a judgment in favor of the Plaintiffs and against the Cuban Defendants for $2,903,233,898.07 (the "Federal Judgment").

      c.      Plaintiffs served each of the Cuban Defendants in strict accordance with the regulations proscribed by the Foreign Sovereign Immunities Act.

      d.      The entire principal amount of the Federal Judgment remains outstanding.

     5.      In the Florida Judgment, attached hereto as Exhibit "A", the Court made the following findings of fact:

      a.      "Plaintiffs Gustavo E. Villoldo ("Gustavo"), born January 21, 1936, and Alfredo Villoldo ("Alfredo"), born June 6, 1937, are United States citizens who have resided in the United States since 1960. Plaintiffs are the sons of decedent Gustavo Villoldo Argilagos.

      b.      Gustavo Villoldo Argilagos was born in Cuba on December 25, 1901. He was a dual citizen of the United States and Cuba. His mother, Marie Villoldo Argilagos, was a United States citizen who was born and raised in New York City. Gustavo Villoldo Argilagos, Casto Villoldo, was a Cuban citizen who was born in Cuba.

      c.      Gustavo Villoldo Argilagos' parents were married in New York in approximately 1897. Gustavo Villoldo Argilagos became a United States national and citizen at his birth.

3

      d.     Gustavo Villoldo Argilagos grew up in Havana, Cuba. He maintained strong ties to the United States. His older brother George was born in the United States and [was working at] the American Embassy in Havana at the time of the acts complained of. Gustavo Villoldo Argilagos attended Candler College in Havana. He then studied law at the University of Havana School of Law, and graduated valedictorian of his class. After earning his law degree, Mr. Villoldo studied business and economics at the Wharton School of Business in the United States.

      e.     Gustavo Villoldo Argilagos subsequently returned to Cuba and opened one of the first General Motors dealerships in Cuba, Villoldo Motor Company. Mr. Villoldo gained enormous financial success. In addition to the automobile dealership, Mr. Villoldo owned an office building, an assembly plant, a parts department and maintenance shop, and a trading company financing automobile loans. He also owned a gas station, a showroom and parking lot, an office building, a 33,000 acre ranch, a ten story apartment building, and numerous real estate holdings, including an oceanfront family estate and two beach homes. Gustavo Villoldo Argilagos was a member of the highest society, participating in international athletic competition, including the 1920 Olympics and later international shooting competitions. He and his family, including Gustavo Villoldo and Alfredo Villoldo enjoyed a life style consistent with this wealth.

      f.     During the early morning hours of January 1, 1959, Fidel Castro assumed control of the government of Cuba. The Villoldo family was targeted by Defendants because of its financial wealth and Gustavo Villoldo Argilagos' American citizenship. Members of Castro's security forces led by Ernesto "Che" Guevara repeatedly accosted Mr. Villoldo and his family members, at their homes and businesses.

g.    On January 6, 1959, fourteen heavily armed, bearded soldiers known as "Los Barbados," surrounded Alfredo Villoldo's home threatening to kill him. Alfredo telephoned his brother for help. Gustavo responded by traveling to Alfredo's house. On arrival Gustavo was accosted by Los Barbudos, who took both Villoldo brothers into custody. Gustavo was kicked and beaten. Both were transported to Palacio de los Deportes (the Sports Palace), where Defendants were administering mass executions.

h.    Gustavo Villoldo was put in a 30' x 30' cell with approximately 140 other prisoners, mostly former police officers and members of the Batista army who had been captured by Castro's forces. Gustavo Villoldo was detained for five days and tortured. While he was interrogated numerous times, he was deprived of food and sleep and was repeatedly informed that he was going to be sent to the Cabana Fortress to be killed by Che Guevera's firing squad for being an American agent.    Gustavo Villoldo and his family members were accused of being lackeys of the United States and Yankee Imperialists. Gustavo Villoldo was beaten during his imprisonment, and his head was placed in a plastic bag threatening to suffocate him. He was taken to a location where other prisoners were executed by firing squad. After five days of confinement and torture aimed toward a confession or the obtaining of information, all of which would have been contrived, he was released. Of the 140 prisoners held with Gustavo Villoldo, Gustavo was one of only a small number who were not executed.

i.    The torment to Gustavo Villoldo Argilagos and his family continued after his sons' release. Che Guevera, members of the rebel army and members of the Ministerio del Interior continued to threaten Mr. Villoldo, and they forcibly removed him from his home with machine guns held to his throat on several occasions. At least two times he was taken to

"El Laguito," a lake where victims of executions were dumped. Mr. Villoldo was also taken to the Ministry of Interior where executions were carried out, and Che Guevera threatened to summarily execute Mr. Villoldo, accusing him of treason. Mr. Villoldo was told repeatedly that he, his sons, and his wife would be killed, unless he acquiesced to the turnover of his property and took his own life. The abductions lasted several hours, and Mr. Villoldo was visibly shaken when he returned, unable to eat or sleep, and at times losing control of his bodily functions. On February 16, 1959, Mr. Villoldo's body was found in his home, an apparent suicide. Mr. Villoldo's businesses and farm were taken over by the Cuban government, and Mr. Villoldo's bank accounts were confiscated.

        j.      Nevertheless, the acts of terrorism continued. While Gustavo and Alfredo were able to leave the island of Cuba, the Defendants continued by actively engaging in efforts toward assassination and threats of assassination, which continued until the middle of 2003."

      6.      In a final judgment entered against Tamiami Health Care & Rehabilitation Center, Inc., executing on Plaintiff's judgment, the same Florida Court on November 25, 2013, revisited its findings from the Florida Judgment and explained its earlier Final judgment as follows:

      a.      "This Court found that the torture inflicted by the Defendants began in January 1959 with the imprisonment and physical torture of the Villoldos that led to the suicide of Mr. Villoldo Sr. and the theft of the Villoldos' enormous wealth by the Republic of Cuba which was then used by Cuba to fund its efforts to support terrorism in Latin America and around the world.

      b.      This Court determined that, for purposes of 28 U.S.C. §1610A, this Court had subject matter jurisdiction because Cuba was designated a state sponsor of terrorism based on its efforts to fund terrorism-based revolutionary efforts and the acts against the Villoldos were the same acts that resulted in the designation of Cuba as a state sponsor of terrorism.

      c.      This Court heard testimony from Gustavo Villoldo regarding his efforts over the course of many decades to suppress the violent terrorism-based revolutionary efforts financed by the Republic of Cuba, and his efforts to track Che Guevera resulting in his death. After hearing the

testimony of Mr. Villoldo and his daughter, Elia Lora, this Court concluded that Mr. Villoldo and his family were subjected to repeated assassination attempts and threats of assassination for decades through 2003 in retaliation by Cuba against Mr. Villoldo.

The Court in that Order further cited, in full, the definition of torture in its Final Judgment and concluded that "the undisputed evidence at trial established that the Defendants' conduct rose to such a level of depravity contemplated by this statute." The Court confirmed that it heard testimony that, on numerous occasions, armed assassins surrounded the Villoldos' home for the purpose of causing severe mental distress and as part of the Defendants' efforts to assassinate members of the Villoldo family, including Gustavo Villoldo. The Court heard testimony from Elia Villoldo, who testified that she and her family would be trapped inside their home witnessing men armed with rifles surrounding the home in an attempt to murder Gustavo Villoldo. The Court concluded that these "threats of assassination and assassination attempts . . . are properly classified as torture." (See Final Judgment at p. 6, attached hereto as Exhibit "B"). In reaching this conclusion, the Court considered that the Villoldos were in the direct physical control of the armed assassins when they surrounded the Villoldos' home."

### The Defendants

7.    Defendant HSBC Bank USA, N.A. ("HBUS") is a federally chartered bank that operates over 470 bank branches throughout the United States, manages assets totaling approximately $200 billion, and serves around 3.8 million customers. HBUS is headquartered in McLean, Virginia, with its principal office in New York, New York. HBUS is a subsidiary of HSBC North America Holdings, Inc. HSBC North America Holdings, Inc. is an indirect subsidiary of Defendant HSBC Holdings, plc.

8.    Defendant HSBC Holdings, plc ("HSBC Holdings") is organized under the laws of England and Wales, headquartered in London, England, and has its principal office in Hong Kong,

China. HSBC Holdings is the ultimate parent company of one of the world's largest banking and financial services groups with approximately 6,900 offices in over 80 countries with over $2.5 trillion in assets (collectively, HSBC Holdings and its subsidiaries are the "HSBC Group"). HSBC Group is comprised of financial institutions throughout the world ("HSBC Group Affiliates") that are owned by various intermediate holding companies and ultimately, but indirectly, by HSBC Holdings.

## FULL FAITH AND CREDIT

9.     Plaintiffs' Florida and Federal Judgments have received recognition under the full faith and credit clause of the United States Constitution in three separate federal courts.

10.     On January 11, 2013, Plaintiffs registered their Federal Judgment in the Western District of Pennsylvania. *Villoldo v. Republic of Cuba*, No. 2:13-mc-00016 (AJS). The Western District of Pennsylvania gave full faith and credit to the Villoldos' Judgment in turning over approximately $2.3 million to the Plaintiffs in partial satisfaction of interest accruing on the Judgment.

11.     On May 17, 2013, Plaintiffs registered their Federal Judgment in the District of Massachusetts. See *Villoldo v. Republic of Cuba*, No. 4:13-mc-94014 (TSH). In turning over approximately $140,000 to the Plaintiffs, the Massachusetts Court specifically held in an Order attached hereto as Exhibit C: "This Order enforces a duly registered Florida state court judgment, recognized by a New York Federal Court and given full faith and credit by this Court." In a subsequent order, attached hereto as Exhibit D, the same Court made the following findings regarding the Plaintiffs' judgment:

> Plaintiffs seek to enforce a duly registered Florida state court judgment, recognized by a New York Federal Court and given full faith and credit by this Court. This Court reviewed the findings of the Florida state court and determined that those findings should be granted full faith and credit. Accordingly, this Court determines

that *the Florida state court had subject matter jurisdiction to enter the Final Judgment and the jurisdictional findings of that court are conclusive.*

*Villoldo v. Republic of Cuba*, No. 4:13-mc-94014 (TSH) (D. Mass.) (Doc. No. 27) (emphasis added).

12.     On June 13, 2013, Plaintiffs intervened in a separate post-judgment proceeding pending against the Republic of Cuba by another judgment creditor of Cuba (the "Vera Case").  In the Vera Case, a garnishee bank, Banco Bilbao Vizcaya Argentaria, S.A., challenged the jurisdiction of both the Florida state court and New York federal court that issued the Villoldos' State and Federal Judgments.  This challenge attacked the underlying subject matter jurisdiction of the Plaintiffs' judgments, alleging that the actions of Cuba and its agents against the Plaintiffs did not meet the definition of terrorist acts stated in 28 U.S.C. § 1605A and that no jurisdiction existed under the Foreign Sovereign Immunities Act.  By Court Order dated August 22, 2014, attached hereto as Exhibit E, the United States District Court for the Southern District of New York rejected the challenges and confirmed that the underlying state and federal court judgments against the Cuban Defendants are valid, entitled to full faith and credit under the United States Constitution, and fully enforceable in all state and federal courts.  *Aldo Vera, et al. v. The Republic of Cuba*, No. 1:12-cv-01596 (AKH) (S.D.N.Y. Aug. 22, 2014) (Doc. No. 666).

## EXECUTION ON BLOCKED CUBAN ASSETS

13.     The Republic of Cuba is a state sponsor of terrorism under section 6(j) of the Export Administration Act of 1979, codified at 50 U.S.C. App. 2405(j).

14.     Under the laws of the United States, financial institutions are prohibited from participating in a financial transaction with a state sponsor of terrorism.  Any funds identified by a financial institution that involves a state sponsor of terrorism, or any of its agencies or instrumentalities, must be immediately blocked and put into a separate blocked account. All frozen

accounts containing property of Cuba or its agencies and instrumentalities are subject to execution

by TRIA judgment creditors of Cuba, without an OFAC license under the laws of the United States.

Accordingly, since 2002, financial institutions were and are aware that assets of Cuba, its agencies

or institutions must be moved to blocked accounts which may be seized by any non-party to the

transaction who holds a judgment against the state sponsor of terrorism or its agency or

instrumentality that caused the blocking.

## DEFENDANTS' STIPULATED ADMISSIONS OF FACT

15.     Defendant HSBC Holdings was the mastermind of an ongoing criminal enterprise

that involved a number of additional coconspirators, including HBUS, in serial violations of state

and federal wire fraud and money laundering laws.  Among the intended victims of the Defendants'

conspiracy were judgment creditors of Cuba, including the Plaintiffs.  Commencing at a point in

time unknown to the Plaintiffs, but at the latest beginning in the mid-1990s, the Defendants acting

in concert with other coconspirators, recognized Cuba's desire to avoid having its transactions

blocked by OFAC sanctions and to avoid detection by judgment creditors of Cuba.  Defendants

and is co-conspirators entered into an ongoing conspiracy through unlawful and illicit wire

transactions.  The object of the conspiracy was (a) to conceal that the funds being transferred in

"stripped" transactions were the true property of Cuban agencies and instrumentalities, (b) to avoid

the application of US sanctions; and, (c) to evade execution upon the funds by judgment creditors

of Cuba.  In furtherance of the conspiracy, HSBC Holdings subsidiaries falsely and illicitly

manipulated the appearance and indicia of ownership to make the funds appear to be the property

of HSBC Holdings subsidiaries.  The fraudulent manipulation of the identity of ownership for the

purpose of concealing the true owners of the funds involved in the "stripped" transactions was the

core purpose of the conspiracy.  These transactions ultimately came to the attention of the Office

of Foreign Assets Control of the United States Department of Treasury, the United States Department of Justice, and the New York County District Attorney's Office. As a result, HSBC Holdings and HBUS became the subject of an ongoing investigation over a number of years. The investigation led to a criminal information which was filed in the United States District Court for the Eastern District of New York and was culminated by a criminal Information being filed and a Deferred Prosecution Agreement in the case of United States of America v. HSBC Bank USA, N.A. and HSBC Holdings, plc (Case No. 1:12-cr-00763-JG). (See Information and Deferred Prosecution Agreement, attached hereto as Exhibits "F" and "G" respectively). As a result of HSBC Holdings and HBUS stipulation to the facts stated in the Information and Statement of Fact ("SOF") to the Deferred Prosecution Agreement, which was attached as Exhibit A, these facts are precluded from contest by the Defendants as a matter of law.

16.     On December 11, 2012, in the Deferred Prosecution Agreement between HSBC Holdings, HBUS and the United States, HSBC Holdings and HBUS agreed that it accepted responsibility for the acts described in the SOF and agreed that the facts described in the SOF were true and accurate. (Deferred Prosecution Agreement at Pg. 2, ¶ 2). The SOF stated, in pertinent part:

    a.  From the mid-1990s through at least September 2006, HSBC Group Affiliates violated both U.S. and New York State criminal laws by knowingly and willfully moving or permitting to be moved illegally hundreds of millions of dollars through the U.S. financial system on behalf of banks located in Cuba, Iran, Libya, Sudan, and Burma, and persons listed as parties or jurisdictions sanctioned by the Office of Foreign Assets Control of the United States Department of the Treasury ("OFAC") (collectively, the "Sanctioned Entities") in violation of U.S. economic sanctions. (SOF at p. 18, ¶ 52).

    b.  HSBC Group Affiliates engaged in this criminal conduct by: (a) following instructions from the Sanctioned Entities not to mention their names in U.S. dollar payment messages sent to HSBC Bank USA and other financial institutions located in the United States; (b) amending and reformatting U.S.

11

dollar payment messages to remove information identifying the Sanctioned Entities; (c) using a less transparent method of payment messages, known as cover payments; and (d) instructing at least one Sanctioned Entity how to format payment messages in order to avoid bank sanctions filters that could have caused payments to be blocked or rejected at HSBC Group or HSBC Bank USA. (SOF at p. 18, ¶ 53).

c.  HSBC Group's conduct, which occurred outside the United States, caused HSBC Bank USA and other financial institutions located in the United States to process payments that otherwise should have been held for investigation, rejected, or blocked pursuant to U.S. sanctions regulations administered by OFAC.  Additionally, by its conduct, HSBC Group: (a) prevented HSBC Bank USA and other financial institutions in the United States from filing required BSA and OFAC-related reports with the U.S. Government; (b) caused false information to be recorded in the records of U.S. financial institutions located in New York, New York; and (c) caused U.S. financial institutions not to make records that they otherwise would have been required by law to make.  (SOF at p. 18, ¶ 54).

d.  The Department [of Justice] alleges, and HSBC Holdings admits, that its conduct, as described herein, violated TWEA. Specifically, HSBC Group violated Title 50, United States Code, Appendix Sections 5 and 16, which makes it a crime to willfully violate or attempt to violate any regulation issued under TWEA, including regulations restricting transactions with Cuba. The Department further alleges, and HSBC Holdings admits, that its conduct, as described herein, violated the International Emergency Economic Powers Act ("IEEPA"). Specifically, HSBC Group violated Title 50, United States Code, Section 1705, which makes it a crime to willfully violate or attempt to violate any regulation issued under IEEPA, including regulations restricting transactions with Iran, Libya, Sudan, and Burma. (SOF at p. 21, ¶ 61).

e.  [The New York County District Attorney's Office] alleges, and HSBC Holdings admits, that its conduct, as described herein, violated New York State Penal Law Sections 175.05 and 175.10, which make it a crime to, "with intent to defraud, . . . (i) make[ ] or cause[ ] a false entry in the business records of an enterprise [defined as any company or corporation] . . . or (iv) prevent[ ] the making of a true entry or cause the omission thereof in the business records of an enterprise." It is a felony under Section 175.10 of the New York State Penal Law if a violation under Section 175.05 is committed and the person or entity's "intent to defraud includes an intent to commit another crime or to aid or conceal the commission thereof." (SOF at p. 21, ¶ 62).

f.  From at least 2000 through 2006, HSBC Group knowingly and willfully engaged in conduct and practices outside the United States that caused

HSBC Bank USA and other financial institutions located in the United States to process payments in violation of U.S. sanctions. To hide these transactions, HSBC Group Affiliates altered and routed payment messages in a manner that ensured that payments involving sanctioned countries and entities cleared without difficulty through HSBC Bank USA and other U.S. financial institutions in New York County and elsewhere. The total value of OFAC-prohibited transactions for the period of HSBC Group's review, from 2000 through 2006, was approximately $660 million. This includes approximately ... $30 million on behalf of Sanctioned Entities in Cuba .... (SOF at p. 21-22, ¶ 63).

g.  Specifically, beginning in the 1990s, HSBC Bank plc ("HSBC Europe"), a wholly owned subsidiary of HSBC Group, devised a procedure whereby the Sanctioned Entities put a cautionary note in their SWIFT payment messages including, among others, "care sanctioned country," "do not mention our name in NY," or "do not mention Iran." Payments with these cautionary notes automatically fell into what HSBC Europe termed a "repair queue" where HSBC Europe employees manually removed all references to the Sanctioned Entities. The payments were then sent to HSBC Bank USA and other financial institutions in the United States without reference to the Sanctioned Entities, ensuring that the payments would be processed without delay and not be blocked or rejected and referred to OFAC. (SOF at p. 22-23, ¶ 65).

h.  HSBC Group was aware of this practice as early as 2000. In 2003, HSBC Group's Head of Compliance acknowledged that amending payment messages "could provide the basis for an action against [HSBC] Group for breach of sanctions." At that time, HSBC Group Compliance instructed HSBC Europe to stop the practice. However, HSBC Europe appealed, and due to the "significant business opportunities" offered by the Sanctioned Entities, HSBC Group's Head of Compliance granted HSBC Europe an extension to continue processing payments in the same manner. HSBC Europe was also concerned about some other factors, including technical and logistical issues with SWIFT, payments, and HSBC Europe's payment processing system. Over the next several years, HSBC Europe and HSBC Middle East Limited ("HSBC Middle East") sought and obtained numerous extensions, allowing the amendment of payment messages from the Sanctioned Entities to continue until 2006. (SOF at p. 23, ¶ 66).

i.  HSBC Bank USA had express policies requiring full transparency in processing payments involving Sanctioned Entities. In 2001, a senior compliance officer at HSBC Group told HSBC Bank USA that HSBC Group would not permit HSBC Group Affiliates to amend payment messages to avoid detection by sanctions filters in the United States. Yet, contrary to this assurance, HSBC Group Affiliates intentionally hid the practice of amending payments involving Sanctioned Entities from HSBC Bank USA. As a result,

during the relevant time period, HSBC Bank USA and other financial institutions in the United States processed hundreds of millions of dollars in transactions involving Sanctioned Entities in violation of U.S. sanctions. (SOF at p. 23, ¶ 67).

j.  Historically, HSBC Group processed U.S. dollar payment messages from and through numerous global locations. During the relevant time period, HSBC Group consolidated its U.S. dollar payment processing so that the payments were predominately processed at HSBC Europe's Multi-Currency Payment Processing Center in England and, later, at HSBC Middle East in Dubai. (SOF at p. 23-24, ¶ 68).

k.  International wire payments generally are executed via the secured communications services provided by SWIFT, and the communications underlying the actual payments are commonly referred to as SWIFT messages. When a bank customer sends an international wire payment, the de facto standard to execute such a payment is the MT 103 SWIFT message (also called a serial payment, or a serial MT 103 payment). When a financial institution sends a bank-to-bank credit transfer, the de facto standard is the MT 202 SWIFT message. The crucial difference, during the relevant time period, was that MT 202 payments typically did not require the bank to identify the originating party to the transactions, and banks typically did not include that information in MT 202 messages.[1] A "cover payment" typically involves both types of messages: an MT 103 message identifying all parties to the transaction is sent from the originating bank to the beneficiary, but the funds are transferred through the United States via an MT 202 message that lacks that detail. Instead of using MT 103 payment messages for transactions involving the Sanctioned Entities, which would have revealed the identity of the ordering customer and beneficiary, HSBC Group used MT 202 "cover payment" messages for these bank to-bank credit transfers, which did not. Consequently, U.S. financial institutions were unable to detect when payments were made to or from a Sanctioned Entity. (SOF at p. 24, ¶ 69).

l.  HSBC Group employees understood that cover payments hid the identity of the ordering customer and beneficiary, and therefore allowed for straight-through processing of transactions that would have otherwise been stopped for review in the United States. They also knew that using MT 103 payments would likely result in the payment being delayed, rejected, or blocked. (SOF at p. 24, ¶ 70).

m.  Although HSBC Europe instituted nominal processes to screen for SDNs when processing transactions from Sanctioned Entities, and make determinations as to whether or not payments fit within certain exceptions such as the U-Turn exemption, they employed inadequately trained payment clerks and untested automated filters in the process. As a result, HSBC

---

[1] Footnote omitted.

Europe could not verify with a sufficient degree of accuracy or reliability whether payments it processed from Sanctioned Entities complied with OFAC restrictions. In processing these payments and sending them to HSBC Bank USA, HSBC Europe provided HSBC Bank USA with no information that the payments involved Sanctioned Entities, and thus prevented HSBC Bank USA from exercising its own due diligence and OFAC screening.[2] (SOF at p. 24-25, ¶ 71).

n.   As early as July 2001, HSBC Bank USA told HSBC Group's Head of Compliance that it was concerned that the use of cover payments prevented HSBC Bank USA from confirming whether the underlying transactions met OFAC requirements. From 2001 through 2006, HSBC Bank USA repeatedly told senior compliance officers at HSBC Group that it would not be able to properly screen Sanctioned Entity payments if payments were being sent utilizing the cover method. These protests were ignored.  (SOF at p. 25, ¶ 72).

o.   HSBC Europe resisted sending serial payments to HSBC Bank USA because it was concerned that payments would be blocked or rejected, and that Sanctioned Entity banks, specifically those from Iran, would discontinue their relationships with HSBC Europe, due to the increased costs associated with serial payments. These Iranian relationships resulted in revenue of millions of dollars per year for HSBC Group Affiliates outside of the United States. It was not until 2006 that HSBC Group ordered all HSBC Group Affiliates to use serial payments for U.S. dollar transactions.  (SOF at p. 25, ¶ 73).

p.   HSBC Europe issued guidelines to deal with transactions that came from the Sanctioned Entities. One of these was to refer flagged payments back to the Sanctioned Entity for "clarification." In doing so, HSBC Europe was alerting the Sanctioned Entity that the payment message as sent was prohibited by OFAC sanctions. The Sanctioned Entities responded by reformatting the payment so that it would be processed through the U.S. clearing banks, including HSBC Bank USA, without being subject to U.S. filters.  (SOF at p. 26, ¶ 76).

17.   On December 11, 2012, in the Deferred Prosecution Agreement between HSBC Holdings, HBUS and the United States, HSBC Holdings and HBUS agreed that that the facts described in the criminal Information attached thereto were true and accurate.  (Deferred Prosecution Agreement at Pg. 2, ¶ 2).  The Information stated, in pertinent part:

---

[2] Footnote omitted.

a.  Defendant HSBC Holdings plc, through its subsidiaries, conducted United States Dollar ("USD") clearing at defendant HSBC Bank USA , N.A., as well as other financial institutions located in the United States. (Information at p. 1-2, ¶ 3).

b.  In or about and between January 2006 and December 2010, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant HSBC Bank USA, N.A., a domestic financial institution, willfully violated the Bank Secrecy Act, Title 31, United States Code, Sections 5318 (h) and 5322(b), by failing to develop, implement and maintain an effective anti-money laundering program. (Information at p. 10, ¶ 19).

c.  Specifically, the defendant HSBC Bank USA, N.A. knowingly and wilfully failed to implement and maintain effective policies, procedures and internal controls to: (a) obtain and maintain due diligence or "know your customer" information on financial institutions owned by HSBC Holdings plc ; (b) monitor wire transfers from customers located in countries which it classified as "standard" or "medium" risk; (c) monitor purchases of physical U.S. dollars ("banknotes") from financial institutions owned by HSBC Holdings plc ; and (d) provide adequate staffing and other resources to maintain an effective anti-money laundering program. (Information at p. 10, ¶ 20).

d.  In or about and between January 2006 and December 2010, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant HSBC Bank USA, N.A., a domestic financial institution, wilfully violated the Bank Secrecy Act, Title 31, United States Code, Sections 53 18(i) and 5322(d), by failing to conduct due diligence on correspondent bank accounts for non-United States persons. (Information at p. 11, ¶ 22).

e.  As part of this offense, the defendant HSBC Bank USA, N.A. knowingly and wilfully failed to obtain and maintain due diligence or "know your customer" information on foreign financial institutions owned by HSBC Holdings plc for which it maintained correspondent accounts, information that if collected and maintained would have reasonably allowed for the detection and reporting of instances of money laundering and other suspicious activity. (Information at p. 11, ¶ 23).

f.  In or about and between January 2001 and December 2006, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant HSBC Holdings plc, together with others, knowingly, intentionally and wilfully facilitated transactions for sanctioned entities in Cuba. (Information at p. 12-13, ¶ 27).

**SENATE REPORT ON DEFENDANTS' ILLICIT ACTIVITIES**

18.     In conjunction with a July 17, 2012 hearing, the United States Senate's Committee on Homeland Security and Governmental Affairs, Permanent Subcommittee on Investigations released a 340 page report, titled *U.S. Vulnerabilities to Money Laundering, Drugs, and Terrorist Financing: HSBC Case History*, which described in detail its findings regarding HSBC's money laundering activities that took place between the mid-1990s and late 2000s ("Senate Report"). (See Senate Report, attached as Exhibit "H").  In a section entitled Transactions Involving Cuba, the Subcommittee described its findings regarding HSBC Holdings' illicit activities to process US dollar transactions on behalf of Cuba, as follows:

    a.   Internal bank documents indicate that, from at least 2002 through 2007, HBUS processed potentially prohibited U.S. dollar transactions involving Cuba. HSBC affiliates in Latin America, in particular, had many Cuban clients and sought to execute transactions on their behalf in U.S. dollars, despite the longstanding, comprehensive U.S. sanctions program and the OFAC filter blocking such transactions.[3] (Senate Report at p. 170).

    b.   In August 2005, a month after HSBC Group issued its new GCL policy barring HSBC affiliates from engaging in U.S. dollar transactions in violation of OFAC prohibitions, HBUS circulated an email identifying correspondent relationships that would be affected.[4] The email stated: "An overriding observation is that the revised policy will most significantly impact the Cuban and Sudan correspondent bank relationships." It also observed: "For Sudan and Cuba, most of our business is conducted in USD and the discussions already initiated with the affected banks will dictate the extent of our ongoing relationships."[5] (Senate Report at p. 170).

    c.   In September 2005, HSBC Group Compliance head David Bagley told HSBC Group CEO Stephen Green that they had closed "a number of USD correspondent relationships with Cuban … banks."[6] On October 3, 2005, Mr. Bagley sent an email to Matthew King, then head of HSBC Group

---

[3] "See OFAC "Sanctions Programs and Country Information," Cuba sanctions (last updated 5/11/2012),   http://www.treasury.gov/resource-center/sanctions/Programs/pages/cuba.aspx." (Senate Report at p. 170, fn. 966).
[4] "See 8/25/2005 email from HBUS Alan Ketley to multiple HSBC colleagues, "GCL050047 – Compliance with OFAC Sanctions," HSBC OCC 3407565-569." (Senate Report at p. 170, fn 967).
[5] "*Id.* at 3407568." (Senate Report at p. 170, fn. 968).
[6] "9/19/2005 email from HSBC David Bagley to HSBC Stephen Green and HSBC Richard Bennett, "GCL050047 "Compliance With Sanctions," HSBC OCC 8874360-362." (Senate Report at p. 170, fn. 969).

Audit, that Mr. Green was "particularly concerned" about ensuring the 2005 GCL was "properly and fully implemented across the Group."[7] Mr. Bagley asked Mr. King to use HSBC's internal audits to help gauge compliance with the new GCL. Mr. King relayed the request to various HSBC auditors and, in response, learned from HSBC Mexico (HBMX) Compliance that the OFAC list had not been fully integrated into HBMX's monitoring system and would not be for another six months, until April 2006.[8] HBMX reported that, pending the systems integration, it had set up "manual controls" in several divisions to implement the new GCL, but "no automated means exists to ensure that these controls are properly being carried out."[9] HBMX explained further that its "greatest exposure" was "the volume of business historically carried out by HBMX customers with Cuba in US dollars."[10] (Senate Report at p. 170).

d.    Mr. King responded that the HBMX transactions raised two sets of concerns, one with respect to the U.S. dollar transactions involving Cuba being run through HBMX's correspondent account at HBUS, and the second with respect to non-U.S. dollar transactions being "transmitted through the HBUS TP gateway," referring to a U.S.-based server that handled transfers from Mexico and South America.[11] Since the United States prohibited transactions involving Cuba, both types of transactions raised questions about whether they ran afoul of the OFAC list and the 2005 GCL. Mr. King responded:

"I note HBMX continues to process USD payments involving Cuba. It is very important that is stopped immediately as the regulators are getting very tough and the cost to the Group could be considerable if a breach occurs, both in terms of the fine and the rectification work which is likely to be a pre-requisite to any settlement.

With regard to non-USD payments as described above, GHQ CMP [Group Headquarters Compliance] are urging HBUS to screen out these transactions to avoid any risk, and HBMX would have to put measures in place to p[re]-empt customer dismay."[12]

(Senate Report at p. 170-71).

---

[7] "10/3/2005 email from HSBC David Bagley to HSBC Matthew King, "GCL 050047 – Compliance with Sanctions," HSBC OCC 8874359-360." (Senate Report at p. 170, fn. 970).

[8] "10/14/2005 email from HBMX Graham Thomson to HSBC Matthew King, "GCL 050047 – Compliance with Sanctions," HSBC OCC 8874358-359." (Senate Report at p. 170, fn. 971).

[9] "*Id.*" (Senate Report at p. 170, fn. 972).

[10] "*Id.*" (Senate Report at p. 170, fn. 973).

[11] "10/17/2005 email from HSBC Matthew King to HBMX Graham Thomson, HSBC David Bagley, and others, "GCL 050047 "Compliance With Sanctions," HSBC OCC 8874357-358." (Senate Report at p. 171, fn. 974).

[12] "*Id.*" (Senate Report at p. 171, fn. 975).

e.  HSBC affiliates from outside of Latin America also occasionally sent potentially prohibited transactions involving Cuba through their HBUS accounts. For example, in December 2006, a payment for $15,350 that had been sent by an HSBC affiliate in the AsiaPacific region was blocked by HBUS, because the transaction documents referred to "Air Tickets Moscow Havana Moscow 3Pax." (Senate Report at p. 171).

f.  In 2007, an internal HSBC document entitled, "Information Requested in Connection With: (North Korea, Cuba, and Myanmar)," revealed that, as of May 2007, HSBC affiliates in Mexico and Latin America were still providing U.S. dollar accounts to Cuban clients, in apparent violation of HSBC Group GCL policy and OFAC regulations." The document indicated that HBMX had 23 Cuban customers with U.S. dollar accounts containing assets in excess of $348,000, and 61 Cuban customers holding both U.S. dollar and Mexican peso accounts with assets totaling more than $966,000.[13] In addition, the report disclosed that HSBC affiliates in Colombia, Costa Rica, El Salvador, Honduras, and Panama were also providing U.S. dollar accounts to Cuban nationals or the Cuban Embassy. The document also indicated that arrangements had been made to "cancel all business relationships with" Cuban clients, in relation to U.S. dollar accounts or commercial relationships for the entire region.[14] These steps were being taken almost two years after the July 2005 GCL had prohibited HSBC affiliates from executing U.S. dollar transactions involving OFAC sensitive persons. (Senate Report at p. 171).

## DEFENDANTS' SETTLEMENT AGREEMENT WITH OFAC

19.    On December 12, 2012, HSBC Holdings entered into a Settlement Agreement with the U.S. Department of Treasury's Office of Foreign Assets Control ("OFAC"), for the purpose of resolving the potential civil liability it faced for violating U.S. sanctions regulations.    (See Settlement Agreement, attached as Exhibit "I").  In the Settlement Agreement, HSBC Holdings

---

[13] "*Id.* In addition, 1, 284 Cuban clients had nearly 2250 HBMX accounts holding solely Mexican pesos, with assets exceeding a total of $8.9 million. Id. at 8876093." (Senate Report at p. 171, fn. 978).

[14] "5/18/2007 HSBC report, "Information Requested in Connection With: (North Korea, Cuba, and Myanmar)," HSBC OCC 8876088-095 at 8876093-095." (Senate Report at p. 171, fn. 979).

agreed to pay OFAC $375,000,000.  HSBC Group's illicit conduct, as it related to Cuba, was

described in the Settlement Agreement in the following factual statements:

a.  In July 2005, HSBC Group Compliance issued a group-wide policy for the first time prohibiting all HSBC Group affiliates from processing U.S. dollar payments that would be prohibited by OFAC regulations. However, the policy allowed the continued use of cover payments … which were to be processed by a specialized compliance review team that checked payments for compliance with U.S. sanctions. The policy failed to stop all occurrences of OFAC violations. (Settlement Agreement at p. 3, ¶ 8).

b.  HSBC Group affiliates … processed transactions involving Burma, Cuba, Libya, and Sudan through the United States during the review period. … [A]lthough multiple HSBC Group affiliate locations utilized cover payments as the default method of payment processing during this time period, several managers appear to have been aware that the use of these message types would result in the omission of references to U.S. sanctioned persons or locations that would otherwise cause payments to be stopped by financial institutions in the United States. (Settlement Agreement at p. 3, ¶ 11).

c.  While the July 2005 GCL appears to have been effective at slowing the number of transactions processed to or through the United States in apparent violation of the Burmese, Cuban, and Sudanese sanctions programs, HSBC Group affiliates continued to use nontransparent cover payments on a periodic basis. In September 2005, an HBEU senior payments official completed an analysis of transactions involving Burma, Cuba, or Sudan over a 10-day period that stopped in HBEU's OFAC interdiction software and were subsequently processed through the United States as bank-to-bank transfers in support of underlying MT-103s. In a September 23, 2005, email to an HSBC Group Money Laundering Control Officer and HSBC Group senior compliance official, the HBEU senior compliance official stated:

The issues surrounding Iran have overshadowed other OFAC payments recently, however, I can advise that we have not so far physically returned any USD payments involving Sudan, Cuba or Burma [since the issuance of the GCL].

(Settlement Agreement at p. 4, ¶ 12).

d.  As recently as August 2007, payment processing audit trails indicate that HSBC Group employees may have facilitated, or were at least aware of, the re-submission of cancelled payments in U.S. dollars which initially contained references implicating U.S. sanctions. (Settlement Agreement at p. 4, ¶ 14).

e.  In November 2008, the head of HBUS Compliance completed an analysis of transactions from 2003 to 2008 that included, inter alia, payments HBUS processed due to the omission or obfuscation of U.S.-sanctions targets in Cuba and Sudan that should have been blocked pursuant to OFAC regulations. The analysis revealed payments processed subsequent to, and in contradiction of, the July 2005 GCL. In a November 6, 2008, email to the head of HSBC Group Compliance, the head of HBUS Compliance stated: "we have nonetheless received a fairly notable number of payments that suggest HSBC banks have not been consistently applying the [July 2005] GCL." (Settlement Agreement at p. 5, ¶ 15).

f.  OFAC has reason to believe that HSBC Group affiliates processed transactions in violation of Executive Orders and/or regulations promulgated pursuant to, inter alia, the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701-06, and the Trading With the Enemy Act ("TWEA"), 50 U.S.C. App. §§ 1-44. (Settlement Agreement at p. 5, ¶ 16).

g.  From on or about March 18, 2004, to on or about December 7, 2007, HSBC Group affiliates processed 40 electronic funds transfers and trade finance transactions in which Cuba or a Cuban national had an interest, in the aggregate amount of $18,817,452, through financial institutions located in the United States in apparent violation of the prohibition against "[a] transfers of credit and all payments between, by, through, or to any banking institution or banking institutions wheresoever located, with respect to any property subject to the jurisdiction of the United States," 31 C.F.R. § 515.201. (Settlement Agreement at p. 5, ¶ 17).

20.  As a direct and proximate result of the improper actions of Defendants HSBC Holdings and HBUS, as described above and admitted by HSBC Holdings and HBUS, HBUS failed to freeze at a minimum over $30 million dollars in transactions involving Cuba and failed to make those funds available to the Plaintiffs to satisfy their judgment.

21.  Plaintiffs' judgments remain outstanding and there are insufficient assets in the United States upon which Plaintiffs can execute.

## COUNT I

## RICO – WIRE FRAUD

22.  Plaintiffs reallege and incorporate by reference paragraphs 1 through 21 of this Complaint as if fully stated herein.

23.     At all relevant times, HSBC Holdings, various subsidiaries of HSBC Holdings, including HBUS and HBMX, and Cuba, its agencies, instrumentalities and other sanctioned Cuban entities, were an "enterprise" within the meaning of 18 U.S.C. § 1961(4) that was engaged in and the activities of which affected, interstate or foreign commerce.

24.     At all relevant times, HSBC Holdings and HBUS were "persons" within the meaning of 18 U.S.C. 1961(3).

25.     Defendants HSBC Holdings and HBUS received income that was derived, directly or indirectly, from a pattern of racketeering activity in which HSBC Holdings and HBUS participated as principals, and used or invested, directly or indirectly, part of such income, or the proceeds of such income, in the acquisition of an interest in, or the establishment or operation of, an enterprise, in violation of 18 U.S.C. 1962(a).

26.     HSBC Holdings, including HBUS and HBMX, and Cuba, its agencies, instrumentalities and other sanctioned Cuban entities conducted or participated and/or conspired to conduct or participate, directly or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity, proximately causing injury to the Plaintiffs, in violation of 18 U.S.C. § 1962(c) and (d).

### Racketeering

27.     HSBC Holdings and HBUS engaged in the following predicate act constituting a "pattern of racketeering," as defined by 18 U.S.C. § 1961(1):

### Wire Fraud

a.     As set forth specifically in the factual allegations of the complaint, HSBC Holdings, including HBUS and HBMX, and Cuba, its agencies, instrumentalities and other

sanctioned Cuban entities perpetrated a fraudulent scheme between at least as early as the mid-1990s and continuing until at least 2008.

      b.    This scheme involved avoiding OFAC regulations through, among other things, eliminating payment data that would have revealed the involvement of Cuba and Cuban agencies and instrumentalities, advising the sanctioned clients on how to conceal their involvement in U.S. dollar transactions, and instructing employees to take specified steps to remove references to the sanctioned entities in payment messages.

      c.    As set forth specifically in the factual allegations of the complaint, HSBC Holdings and its subsidiaries' senior management were fully aware of these practices.

      d.    HSBC Holdings and HBUS moved illegally more than $30 million through the U.S. financial system on behalf of Cuban agencies and instrumentalities and others subject to Cuban sanctions.

      e.    HSBC Holdings, HBUS, and Cuba, its agencies, instrumentalities and other sanctioned Cuban entities used the wires to perpetrate the scheme: HSBC Holdings and HBUS used the wires to provide international banking services, including international fund transfers.

      f.    The scheme was intended, among other things, to create the impression that OFAC filters were being utilized by HBUS, but to avoid triggering them, and to keep unaffiliated U.S. financial institutions from rejecting, blocking or stopping transactions for investigation under OFAC regulations, for transactions involving Cuban agencies and instrumentalities.

      g.    But for HSBC Holdings and HBUS's money laundering activities, the above described funds would be blocked by U.S. financial institutions through an OFAC filter and would have been used to satisfy Plaintiffs' judgment against Cuba, under § 201(a) of the TRIA and 1610(g) of the FSIA.

h.      As a result, Plaintiffs suffered damages in the amount of $30 million.

i.      These acts, alleged in paragraphs 1 through 15 of the complaint, constitute wire fraud under 18 U.S.C. § 1343.

j.      Wire fraud is a "racketeering activity" under 18 U.S.C. § 1961(1).

k.      In order to conceal that the funds involved in the illicit transactions were the true property of Cuban agencies and instrumentalities, avoid the application of US sanctions, and evade execution upon the funds by judgment creditors of Cuba, HSBC Holdings and its subsidiaries falsely and illicitly manipulated the appearance and indicia of ownership to make the funds appear to be the property of HSBC Holdings' subsidiaries. The fraudulent manipulation of the identity of ownership for the purpose of concealing the true owners of the funds involved in the illicit transactions was the core purpose of the conspiracy.

## Plaintiffs' Injuries

28.     Plaintiffs were injured as a result of HSBC Holdings and HBUS's conduct, suffering damages to property, the inability to collect on their judgment, in the amount of $30 million.

29.     Had not HSBC Holdings and HBUS perpetrated the racketeering scheme, funds would have been frozen by OFAC and the Plaintiffs would have been able to collect the foregoing funds against their judgment.

30.     As damages, Plaintiffs are entitled to recover from HSBC Holdings and HBUS: actual, consequential and incidental damages, in the amount to be determined at trial, but believed to be no less than $30 million; treble damages or $90 million; attorney's fees and costs; interest at the legal rate; and such other and further relief as the Court deems appropriate.

## COUNT II

## RICO – MONEY LAUNDERING

31.　Plaintiffs reallege and incorporate by reference paragraphs 1 through 21 of this Complaint as if fully stated herein.

32.　At all relevant times, HSBC Holdings, various subsidiaries of HSBC Holdings, including HBUS and HBMX, and Cuba, its agencies, instrumentalities and other sanctioned Cuban entities, were an "enterprise" within the meaning of 18 U.S.C. § 1961(4) that was engaged in and the activities of which affected, interstate or foreign commerce.

33.　At all relevant times, HSBC Holdings and HBUS were "persons" within the meaning of 18 U.S.C. 1961(3).

34.　Defendants HSBC Holdings and HBUS received income that was derived, directly or indirectly, from a pattern of racketeering activity in which HSBC Holdings and HBUS participated as principals, and used or invested, directly or indirectly, part of such income, or the proceeds of such income, in the acquisition of an interest in, or the establishment or operation of, an enterprise, in violation of 18 U.S.C. 1962(a).

35.　HSBC Holdings, including HBUS and HBMX, and Cuba, its agencies, instrumentalities and other sanctioned Cuban entities conducted or participated and/or conspired to conduct or participate, directly or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity, proximately causing injury to the Plaintiffs, in violation of 18 U.S.C. § 1962(c) and (d).

### Racketeering

36.　HSBC Holdings and HBUS engaged in the following predicate act constituting a "pattern of racketeering," as defined by 18 U.S.C. § 1961(1):

## Laundering of Monetary Instruments

a.      As set forth specifically in the factual allegations of the complaint, between at least the mid-1990s and continuing until at least 2008, HSBC Holdings caused its subsidiaries to transfer funds belonging to Cuba, its agencies, instrumentalities and other sanctioned Cuban entities through HBUS and unaffiliated U.S. financial institutions.

b.      The funds that HSBC Holdings caused to be transferred were the proceeds of specified unlawful activity, including wire fraud under 18 U.S.C. § 1343.

c.      HSBC Holdings knew that the funds it transferred were the proceeds of specified unlawful activity, including wire fraud under 18 U.S.C. § 1343.

d.      HSBC Holdings made these transfers with knowledge that they were designed, in whole or in part, to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of the specified unlawful activity.

e.      There were numerous instances in which funds were transferred under these circumstances.

f.      These fund transfers constitute the laundering of monetary instruments under 18 U.S.C. § 1956.

g.      Laundering of money instruments is "racketeering activity" under 18 U.S.C. § 1961(1).

h.      In order to conceal that the funds involved in the illicit transactions were the true property of Cuban agencies and instrumentalities, avoid the application of US sanctions, and evade execution upon the funds by judgment creditors of Cuba, HSBC Holdings falsely and illicitly manipulated the appearance and indicia of ownership to make the funds appear to be the property of HSBC Holdings' subsidiaries.   The fraudulent manipulation of the identity of

ownership for the purpose of concealing the true owners of the funds involved in the "stripped"

transactions was the core purpose of the conspiracy.

**Plaintiffs' Injuries**

37.     Plaintiffs were injured as a result of HSBC Holdings and HBUS's conduct,

suffering damages to property arising from their judgment, in the amount of $30 million.

38.     Had not HSBC Holdings and HBUS perpetrated the racketeering scheme, funds

would have been frozen by OFAC and the Plaintiffs would have been able to collect on their

judgment.

39.     As damages, Plaintiffs are entitled to recover from HSBC Holdings and HBUS:

actual, consequential and incidental damages, in the amount to be determined at trial, but believed

to be no less than $30 million; treble damages or $90 million; attorney's fees and costs; interest at

the legal rate; and such other and further relief as the Court deems appropriate.

<u>**COUNT III**</u>

<u>**Fraudulent Transfer -**</u>
<u>**New York Debtor and Creditor Law § 279**</u>

40.     Plaintiffs reallege and incorporate by reference paragraphs 1 through 21 of this

Complaint as if fully stated herein.

41.     At all relevant times, HSBC Holdings and HBUS knew or should have known that

it was illegally processing transactions for agencies and instrumentalities of Cuba and that Cuba

was therefore the beneficial owner of billions of dollars in assets involved in the illicit transactions

described above in which HSBC Holdings and HBUS participated; and processing the payments

involved in these illicit transactions for the benefit of Cuban banking institutions and Cuban

agencies and instrumentalities would require the services of U.S. financial institutions or HSBC

Holdings' subsidiaries, including, but not limited to, HBUS's New York branch.

42.     At all relevant times, HBUS was required by applicable U.S. law to block transactions involving Cuban banking institutions, and various other agencies and instrumentalities of Cuba and to report those blocked transactions to OFAC in a timely manner.

43.     In furtherance of HSBC Holdings and HBUS's unlawful attempt to move Cuban assets through the U.S. financial system, HSBC Holdings intentionally concealed the status of agencies and instrumentalities of Cuba as the beneficial owners of millions of dollars that were handled and processed by HSBC Group.

44.     Because of HSBC Holdings and HBUS's unlawful conduct, millions of dollars in which Cuba or its agencies and instrumentalities had an ownership interest were illicitly processed through HSBC Holdings' subsidiaries and branches, including, but not limited to HBMX and HBUS's New York branch, in "stripped" or otherwise fraudulent transactions, without the required notice to OFAC and New York's banking regulators.

45.     HSBC Holdings and HBUS were prohibited by law from engaging in the "stripped" transfers that it passed through its New York branch.  In addition, HBUS was required by law to report to OFAC the participation of OFAC-designated Cuban entities in the illicit transactions, and to refuse to effect transfers involving those entities, and to block the assets involved in those transactions.

46.     HSBC Holdings and HBUS were beneficiaries of the "stripped" transfers.  HSBC Holdings and HBUS directly benefited from their involvement and receipt of Cuban funds by charging and collecting substantial fees and commissions from the Cuban agencies and instrumentalities in exchange for the transfer services that HSBC Holdings' subsidiaries provided.

47.     The aforementioned illicit transfers were fraudulent, under New York law, because the transfers were not for fair consideration, and HSBC Holdings' subsidiaries, including HBUS,

as transferees, lacked good faith, and the purpose of the transfer was to frustrate creditors of Cuba, including Plaintiffs.

48.   As of April 24, 1997, the effective date of 28 U.S.C. § 1605(a)(7), which established a cause of action for terrorism related injuries and death, the Plaintiffs' claims against Cuba and its agencies and instrumentalities had fully accrued, making them creditors of Cuba and its agencies and instrumentalities, under New York law.

49.   As of April 24, 1997 and continuing until the present day, Cuba did not have sufficient assets within the United States to satisfy the Plaintiffs' claims,

50.   The illicit transfers of Cuban assets facilitated by HSBC Holdings and HBUS completely disposed of the funds transferred therein, by causing the funds at issue to be removed from the United States, making them uncollectable and un-attachable by the Plaintiffs.  These illicit transfers were made with the actual intent to hinder, delay and defraud Cuba's creditors, including Plaintiffs.

51.   Plaintiffs were injured as a result of HSBC Holdings and HBUS's conduct, suffering damages as a result of their inability to collect upon the funds of the judgment debtor, which HSBC Holdings and HBUS caused to be completely disposed of and moved outside of the United States.

52.   Had HSBC Holdings and HBUS complied with applicable laws and regulations, assets of Cuba and its agencies and instrumentalities moved outside of United States in the illicit transfers would have been frozen by OFAC, and Plaintiffs would have subsequently executed their Judgment against these assets.

53.   Plaintiffs are entitled to recover from HSBC Holdings and HBUS compensatory damages in equivalent value to the assets of Cuba and its agencies and instrumentalities that HSBC

Holdings and HBUS illicitly transferred outside of the United States as described above, in a total amount to be determined at trial; interest at the legal rate; and such other and further relief as the Court deems appropriate.

WHEREFORE, Plaintiffs Alfredo Villoldo, individually, Gustavo E. Villoldo, individually and as Administrator, Executor, and Personal Representative of the Estate of Gustavo Villoldo Argilagos respectfully demand that judgment be entered in their favor and against Defendants HSBC Holdings and HBUS as follows,

As to Count I, RICO – Wire Fraud:

    A.    actual, consequential and incidental damages, in the amount to be determined at trial, but believed to be no less than $30 million;
    B.    treble damages of not less than $90 million;
    C.    attorney's fees and costs;
    D.    interest at the legal rate; and
    E.    such other and further relief as the Court deems appropriate;

As to Count II, RICO – Money Laundering:

    A.    actual, consequential and incidental damages, in the amount to be determined at trial, but believed to be no less than $30 million;
    B.    treble damages of not less than $90 million;
    C.    attorney's fees and costs;
    D.    interest at the legal rate; and
    E.    such other and further relief as the Court deems appropriate.

As to Count III, Fraudulent Transfer - New York Debtor and Creditor Law § 279:

    A.    damages in an amount to be determined at trial;
    B.    interest at the legal rate; and
    C.    such other and further relief as the Court deems appropriate.

**JURY TRIAL DEMANDED**

Dated: January 22, 2015

HALL, LAMB and HALL, P.A.

Brandon Levitt (Admitted in this Court)
Andrew C. Hall (Lead Counsel)*
Roarke Maxwell *
2665 South Bayshore Drive, PH1
Miami, Florida 33133
Telephone: (305) 374-5030
Fax: (305) 374-5033
blevitt@hlhlawfirm.com
andyhall@hlhlawfirm.com
rmaxwell@hlhlawfirm.com

Attorneys for Plaintiffs
* *pro hac vice* motion to be filed

FRANKFURT KURNIT KLEIN & SELZ, P.C.

By:    Edward H. Rosenthal
Beth I. Goldman
Nicole Bergstrom
488 Madison Avenue, 10th Floor
New York, NY 10022
Telephone (212) 826-5524
Facsimile (212) 593-9175
erosenthal@fkks.com
bgoldman@fkks.com
nbergstrom@fkks.com